# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Christopher L.W.,

        Plaintiff,

v.

Martin J. O'Malley,
*Commissioner of Social Security Admin.*,

        Defendant.

Case No. 23-cv-1978 (KMM/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Christopher L.W.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner denying his application for disability insurance benefits and his application for supplemental security income. (*See generally*, Dkt. 1.) The parties have filed briefs "present[ing] for decision" Plaintiff's request for judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").[1] (*See* Dkts. 16, 18, 22.)

For the reasons stated below, Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 16, 22) should be denied and the Commissioner's request that the Court affirm the decision (Dkt. 18) should be granted.

---

[1] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

## I.    BACKGROUND

On March 27, 2021, Plaintiff protectively filed applications for Title II Disability Insurance benefits and for Title XVI Supplemental Security Income, alleging disability as of November 1, 2018, due to several mental conditions, including mental delay, a learning disability, anxiety, and depression.  (R. 277-85, 321.)[2]  His application was denied initially and on reconsideration.  (R. 132-147, 150-67.)  Plaintiff requested a hearing, and on August 2, 2022, Plaintiff appeared for an online video hearing before Administrative Law Judge Erin T. Schmidt ("the ALJ").  (R. 16.)  The ALJ issued an unfavorable decision on August 18, 2022, finding Plaintiff was not disabled.  (R. 16-28.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a) and 20 C.F.R. § 416.920(a),[3] the ALJ first determined at step one that

---

[2]    The Social Security Administrative Record ("R.") is available at Docket 12.

[3]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")]  is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

Plaintiff had not engaged in substantial gainful activity since November 1, 2018, the alleged onset date of disability. (R. 19.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: borderline intellectual functioning, generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder ("PTSD") and adjustment disorder. (R. 19.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 19.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine tasks, occasional interaction with coworkers and supervisors, no interaction with the general public, no tandem tasks with coworkers, no fast paced production requirements defined as work requiring hourly or more frequent production quotas, only occasional reading and writing, and occasional mathematical tasks with no requirement for complex skills in these areas or handling of money.

(R. 21.) The ALJ found that Plaintiff was unable to perform any past relevant work. (R. 26.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including: as a janitor (Dictionary of Occupational

Titles ("DOT") 381.687-014); a laundry laborer (DOT 361.687-018); and warehouse worker (DOT 922.687-058). (R. 27.)

Accordingly, the ALJ deemed Plaintiff not disabled from his alleged date of onset of disability on November 1, 2018, through the date of the ALJ's decision on August 18, 2022. (R. 28.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 2-6.) Plaintiff then commenced this action for judicial review. (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions. In this case, because Plaintiff's challenge is limited to an issue relating to his mental health, the Court recounts only the record and testimony relevant to that impairment.

## II.    RELEVANT RECORD

On August 23, 2019, Plaintiff was seen at the emergency room with complaints of increasing depression, anxiety, and an evaluation for suicidal ideation. (R. 415, 558.) Plaintiff noted that his memory and concentration were slightly decreased, but that social isolation had not been occurring, and he was in fact more social. (R. 416.) Plaintiff noted being a little more irritable, which he believed was because he was not getting help. (R. 416.) A mental examination showed that Plaintiff was alert and oriented in all

4

spheres, his recent memory was slightly diminished, his remote memory was intact, he did not suffer from hallucinations or delusions, he did well with simple math problems, his mood was good, and he denied any suicidal or homicidal ideations. (R. 417.) The assessment for Plaintiff was anxiety disorder unspecified versus mood disorder unspecified, rule out adjustment disorder with anxious mood. (R. 417.) Given the lack of symptoms, the medical provider did not prescribe him any medications, and instead recommended therapy and working to reduce his stressors. (R. 417.) He was ultimately given medication for his insomnia and discharged on August 27, 2019, with a diagnosis of "Adjustment disorder with mixed emotional features, rule out additional anxiety disorder unspecified." (R. 414.)

On August 29, 2019, Plaintiff was seen for a follow-up regarding his hospitalization. (R. 556, 649.) Plaintiff communicated that he had been staying at a group home and was doing well overall. (R. 556.) Plaintiff was not in any acute distress and showed a normal mood and affect. (R. 557.) Plaintiff was assessed with anxiety and major depression without psychotic features. (R. 558.)

On September 17, 2019, Plaintiff underwent an interview by a licensed social worker at the group home for adults with mental health disabilities that he had been staying at for the previous 9 months. (R. 420.) It was noted that he was hospitalized a month earlier with threats of killing himself. (R. 420.) He had been identified with a learning disability in elementary school and reported being bullied, as well as being assaulted after high school. (R. 420-22.) Plaintiff reported starting a lawn mowing business and that he was married. (R. 420.) Plaintiff's symptoms included difficulty

falling and staying asleep; some depressed mood; suicidal thoughts without plan; irritability; and aggravated startle.  (R. 420-21.)  Based on Plaintiff's reports, he had mild anxiety under the GAD-7 and mild depression under the PHQ-9.[4]  (R. 421.)  Plaintiff's mental status examination showed that his appearance was normal; his mood was anxious; he had a cooperative attitude, an appropriate affect, normal speech, tense motor activity; he was fully oriented; and he showed impulsive judgement, intact insight, and an average intelligence.  (R. 421.)  Plaintiff showed no risk of violence.  (R. 421-22.)  The assessment was PSTD based on the past bullying, past homelessness, and assaults.  (R. 422.)  His trauma symptoms included avoidance of environments with high stimulus, including places of employment.  (R. 422.)  Given these circumstances, it was medically necessary for him to receive certain supportive services, including individual therapy. (R. 423.)

During an October 22, 2019 examination, Plaintiff's mood was good and his affect was full.  (R. 648.)  He was also grossly oriented, pleasant, and cooperative.  (R. 648.)

On December 13, 2019, Plaintiff was seen for a follow-up related to his mental health.  (R. 552, 646.)  Plaintiff represented that his depression had been better and that he had not had any thoughts of hurting himself since his last hospitalization.  (R. 552.)

---

[4]     The Generalized Anxiety Disorder 7-item (GAD-7) is an anxiety screening tool. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7306644/ (last visited May 31, 2024).  A score of 5-9 indicates mild anxiety; 10-14 indicates moderate anxiety; and greater than 15 indicates severe anxiety.  *Id.*  The PHQ-9 score is a depression screening tool.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited May 31, 2024).  A score of 5-9 indicates mild depression, a score of 10-14 indicates moderate depression, 15-19 indicates moderately severe depression, and 20-27 indicates severe depression.  *Id.*

He noted some occasional PTSD flashbacks, but represented that he had coping mechanisms available, which seemed to be working.  (R. 552.)  Plaintiff's examination showed: "His mood is good and affect is full.  He is grossly oriented, pleasant, and cooperative. Behavior and appearance within normal limits.  Thought process logical." (R. 552.)

At a June 16, 2020 medication follow-up, Plaintiff admitted that he had been missing his trazadone medication and was starting to feel a reoccurrence of his depression, although it was not severe.  (R. 550, 645.)  He noted that he was seeing a therapist, which was helpful.  (R. 551.)  The mental health examination showed he had a normal affect, but his mood was depressed.  (R. 551.)  His speech, behavior, thought content, and memory were all normal.  (R. 551.)  Plaintiff was started on Prozac to help his breakthrough depression.  (R. 551.)

On January 4, 2021, Plaintiff was seen in the emergency department with suicidal ideations.  (R. 541.)  Plaintiff reported feeling significantly suicidal, which prompted him to go to the emergency room.  (R. 541.)  Plaintiff claimed that he had been robbed 5 months earlier at a group home he had been staying at and witnessed his possessions stolen by a group of men.  (R. 541.)  Since that time, he claimed feeling intermittently paranoid, depressed, and suicidal.  (R. 541.)  Plaintiff was positive for dysphoric mood, anxiousness, and suicidal ideas, but negative for self-injury.  (R. 541.)  He demonstrated a normal affect and behavior.  (R. 542.)  Plaintiff contracted for safety and was discharged to his group home the same day.  (R. 544.)

On January 11, 2021, Plaintiff was seen for a follow-up for his depression. (R. 539, 643.) Plaintiff claimed that he was started on Prozac back in June, noting that the medication was helpful, but said that he had experienced a significant bout of depression again on January 4, for which he was seen in the emergency room for suicidal ideation. (R. 539.) He reported no ideations during the appointment. (R. 539.) Plaintiff noted he was living in a group home and was he was doing "okay," although he was slightly struggling with depression. (R. 539.) Plaintiff felt like speaking with a counselor once a week would be helpful, and said that he had never been evaluated by psychiatry. (R. 539.) Plaintiff's dosage of Prozac was increased. (R. 540.)

At a January 15, 2021 behavioral health progress appointment, Plaintiff reported that he had "been doing okay." (R. 535.) Plaintiff reported that he had lived at a group home for about two years. (R. 535.) Plaintiff claimed that he had not been able to maintain employment due to his symptoms. (R. 535.) Plaintiff's GAD-7 score was 15. (R. 536.) There was no identifiable risk of aggression for Plaintiff. (R. 538.) Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; and had an "okay" mood and normal affect. (R. 538.) His thought process was logical and his concentration and attention were fair. (R. 538.) Plaintiff displayed no homicidal ideations or psychotic symptoms; displayed rumination; was alert and oriented; he displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage. (R. 538.) Plaintiff was diagnosed with adjustment disorder with anxiety. (R. 538.)

During a January 22, 2021 behavioral health progress appointment, Plaintiff reported that he had been experiencing increased paranoia where he lived related to his past assaults. (R. 531.) Plaintiff asserted that he did not like going outside by himself because he was worried that he would be attacked. (R. 531.) There was no identifiable risk of aggression for Plaintiff. (R. 533.) Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; and had an "okay" mood and normal affect. (R. 533.) His thought process was logical and his concentration and attention were fair. (R. 533.) He displayed no homicidal ideations or psychotic symptoms; displayed rumination; was alert and oriented; displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage. (R. 533.) Plaintiff was diagnosed with adjustment disorder with anxiety and symptoms of PTSD. (R. 534.)

During a February 1, 2021 behavioral health progress appointment, Plaintiff reported that he had been trying to get by and continued to feel uncomfortable in his current living environment related to the number of people that lived there that he did not know. (R. 527.) Plaintiff continued to experience memories of past assault attempts, and was afraid that it would happen again. (R. 527.) Plaintiff's PHQ-9 score was 12 and his GAD-7 score was 9. (R. 527-28.) There was no identifiable risk of aggression for Plaintiff. (R. 529.) Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; he displayed no homicidal ideations or psychotic

symptoms; displayed rumination; was alert and oriented; displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 529-30.)  His thought process was logical and his concentration and attention were fair.  (R. 530.)  Plaintiff was diagnosed with adjustment disorder with anxiety, passive suicidal ideations, and symptoms of PTSD.  (R. 530.)

On February 9, 2021, Plaintiff underwent a neuropsychological evaluation by Timothy Rysavy, PsyD, LP.  (R. 440.)  His examination showed that he was alert and oriented to person, but only partially to place and time.  (R. 442.)  He was pleasant and cooperative; his motor activity was unremarkable; his speech was of grossly normal rate and volume; his conversation was goal-directed; his mood was reported to be depressed and his affect was generally mood congruent, but he was noted to laugh at times as well; and he required occasional repetition and clarification of task instructions.  (R. 442.)  When compared to other individuals of his same age, his overall intellectual functioning was in the borderline range, with a Full Scale IQ of 77.  (R. 442.)  From a neuropsychological standpoint, there was evidence of slower cognitive processing speed, poor attention, reduced planning and organization, and impaired learning and recall of unstructured verbal material.  (R. 443-44.)  Plaintiff's reports and symptomology supported a diagnosis of major depression and PTSD.  (R. 444.)  Plaintiff reported hypervigilance and social avoidance.  (R. 444.)  Suggestions for treatment included optimizing medications, a psychiatric consultation, therapy, exercise, and a healthy diet. (R. 444.)

During a February 15, 2021 behavioral health progress appointment, Plaintiff reported that he had been doing pretty well, felt like he was making progress, and claimed that he was staying at his "wife's" place at night.  (R. 518.)  Plaintiff talked about his difficulty with people that have authority over him and that he found himself getting defensive, which was not always helpful to him in reaching his overall goal, including his concern that he would be this way when he had his upcoming disability hearing.  (R. 518.)  He was engaged and responsive through his appointment.  (R. 518.)  There was no identifiable risk of aggression for Plaintiff.  (R. 521.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; he displayed no homicidal ideations or psychotic symptoms; displayed rumination; was alert and oriented; displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 521.)  His concentration and attention were fair and his thought process was logical.  (R. 521.)  Plaintiff was diagnosed with PTSD.  (R. 521.)

During a March 1, 2021 behavioral health progress appointment, Plaintiff reported that he had been "doing okay", but was starting to feel overwhelmed by completing his social security disability application.  (R. 509.)  There was no identifiable risk of aggression for Plaintiff.  (R. 512.)  His GAD-7 score was 6.  (R. 509.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; he displayed no homicidal ideations or psychotic symptoms; displayed rumination; was alert and oriented;

displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage. (R. 512.) His concentration and attention were fair and his thought process was logical. (R. 512.) Plaintiff was diagnosed with PTSD. (R. 512.)

On March 3, 2021, Plaintiff was seen for a psychiatric assessment by Sheeba Rahman, MD. (R. 453.) Plaintiff claimed to be moderately depressed. (R. 453.) He asserted his medications helped "somewhat," but that his medications needed to be adjusted often. (R. 453.) Plaintiff claimed to be suffering from worry, irritability/agitation and nervousness, intense fear, intrusive thoughts, nightmares, flashbacks and psychological distress from cues, paranoid delusions, and auditory hallucinations. (R. 455.) Plaintiff rated the severity of his anxiety as 3 out of 10. (R. 435.) Plaintiff's PHQ-9 score was 12 and his GAD-7 score was 8. (R. 453.) No impulse control symptoms were present. (R. 455.) Plaintiff's mental status examination showed that he was oriented to time, person, place and to situation; he was well groomed; was cooperative; had a normal affect; denied a homicidal or suicidal ideation; and displayed intact judgement, intact remote memory, and a focused concentration. (R. 455.)

During a March 15, 2021 behavioral health progress appointment, Plaintiff's PHQ-9 score was 12 and his GAD-7 score was 8. (R. 500.) There was no identifiable risk of aggression for Plaintiff. (R. 502.) Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented. His thought

process was logical and his concentration and attention were fair.  (R. 503.) He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 503.) Plaintiff was diagnosed with PTSD.  (R. 503)

As part of Plaintiff's March 22, 2021 behavioral health progress appointment, it was noted that Plaintiff was stable and staying with friends at night.  (R. 495.)  There was no identifiable risk of aggression for Plaintiff.  (R. 498.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; he displayed no homicidal ideations or psychotic symptoms; displayed rumination; was alert and oriented; displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 498.)  His thought process was logical and his concentration and attention were fair.  (R. 498.) Plaintiff was diagnosed with PTSD.  (R. 498)

On April 5, 2021 Plaintiff was seen for a follow-up with respect to his depression. (R. 493, 641.)  Plaintiff reported that he continued to struggle with some depression, although he reported that his symptoms were significantly improved.  (R. 493.)  Plaintiff had been taking fluoxetine (Prozac) and trazodone.  (R. 494.)  Plaintiff reported that the increase in fluoxetine had been significantly helpful for treatment of his depression.  (R. 493.)  While he occasionally had suicidal thoughts, he had no plan, or thoughts of following through with any of these thoughts.  (R. 493.)  Plaintiff stated, "that overall he feels he is doing much better."  (R. 493.)  He also reported that behavioral therapy had

been helpful.  (R. 493.)  Plaintiff's examination showed he was not in any distress; was appropriately dressed and groomed; was cooperative; had a euthymic mood; and had an appropriate affect.  (R. 494.)  His thought process was logical, goal oriented, and organized.  (R. 494.)  The assessment for Plaintiff was severe recurrent depression and PTSD.  (R. 494.)  Plaintiff's dosage of Prozac was increased.  (R. 494.)

As part of an April 6, 2021 behavioral health progress appointment, it was noted that Plaintiff claimed he had been experiencing some increased irritability and noted that he stayed with a friend at night because he felt safer there than at the group home.  (R. 489.)  There was no identifiable risk of aggression for Plaintiff.  (R. 492.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 492.)  His thought process was logical and his concentration and attention were fair.  (R. 492.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 492.)  Plaintiff was diagnosed with PTSD.  (R. 492)

As part of Plaintiff's April 14, 2021 behavioral health progress appointment, it was noted that Plaintiff had an "okay week" and that he stayed with friends at night because he felt safer there than at the group home where he stayed during the day.  (R. 484.)  Plaintiff was engaged throughout the appointment, and was focused on his social security application, as well as securing new housing.  (R. 484.)  There was no identifiable risk of aggression for Plaintiff.  (R. 487.)  Plaintiff's mental status

examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 487-88.)  His thought process was logical and his concentration and attention were fair. (R. 487-88.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 488.)  Plaintiff was diagnosed with PTSD.  (R. 487.)

During an April 21, 2021 behavior health appointment, it was noted that Plaintiff had been "doing okay."  (R. 480.)  There was no identifiable risk of aggression found for Plaintiff.  (R. 481-82.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 483.)  His thought process was logical and his concentration and attention were fair.  (R. 483.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 483.) Plaintiff was diagnosed with PTSD.  (R. 483.)

As part of an April 28, 2021 behavioral health progress appointment, Plaintiff shared that several people got into a fight at his group home and that the police had to be called.  (R. 475.)  Plaintiff claimed this event activated memories of past attacks he had experienced, but noted that he just left the area, along with his roommate, during the fight.  (R. 475.)  Plaintiff's GAD-7 score was 6.  (R. 476.)  There was no identifiable risk

of aggression.  (R. 478.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 478.)  His thought process was logical and his concentration and attention were fair.  (R. 478.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 478.)  Plaintiff was diagnosed with PTSD.  (R. 479.)

As part of a May 5, 2021 behavioral health progress appointment, Plaintiff asserted overall that his mood had "been okay," and he continued to focus on what he could control and doing tasks required of him to move him towards the goal of independent housing.  (R. 470.)  He spent most of his time in his room while in his group home, but that he spent the night at his "friend's."  (R. 470.)  There was no identifiable risk of aggression.  (R. 473.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had a mood that was "okay" and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 473-74.)  His thought process was logical and his concentration and attention were fair.  (R. 474.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 474.)

On May 14, 2021, Plaintiff was seen by Kathryn Mechelke, MD, for a follow-up regarding his depression and to fill out disability paperwork.  (R. 468, 640.)  Plaintiff had

a history of severe recurrent major depression and PTSD.  (R. 468.)  Plaintiff felt he had

been managing his depression better since he started therapy, as well as increasing his

fluoxetine to 60 mg daily.  (R. 468.)  Plaintiff had a PHQ-9 score of 10.  (R. 468.)

Plaintiff stated that he had no active intent to harm himself and that his current living

conditions in a group home had been feeding his depression.  (R. 468.)  Plaintiff had been

working to build his confidence in socializing with other group home members, but he

struggled to go outside of the home to socialize.  (R. 468.)  Plaintiff's exam showed that

he was not in any acute distress, his mood was good, his affect was full, his thought

process was logical, he was grossly oriented, pleasant, and cooperative, and his behavior

and appearance were within normal limits.  (R. 469.)  Plaintiff was assessed with

recurrent major depression without psychotic features, PTSD, and insomnia.  (R. 469.)

Dr. Mechelke found that Plaintiff was unable to work.  (R. 469.)

During a May 20, 2021 behavioral appointment, Plaintiff asserted that he was

excited because he was hopeful that he would qualify for social security.  (R. 464.)  There

was no identifiable risk of aggression.  (R. 467.)  Plaintiff's mental status examination

showed that he was appropriately groomed; was cooperative and engaged; showed

normal speech; had a good mood and normal affect; displayed no homicidal ideations or

psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 467.)  His

thought process was logical and his concentration and attention were fair.  (R. 467.)  He

displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight

and judgment; and displayed developmentally appropriate language usage.  (R. 467.)

Plaintiff was diagnosed with PTSD.  (R. 467.)

During a June 1, 2021 behavioral progress appointment, Plaintiff explained that he started looking for housing and had started to take care of his own transportation, as a way to start building some independence. (R. 459, 627.) Plaintiff reported that he continued to experience flashbacks from when he was attacked. (R. 459.) He also reported continuing to avoid places and situations related to his past assaults. (R. 459.) Plaintiff acknowledged that he had been able to manage his symptoms better and had been working towards his goals of increased independence. (R. 459.) Plaintiff's PHQ-9 score was 12 and his GAD-7 score was 13. (R. 459-60.) There was no identifiable risk of aggression. (R. 462.) Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had a good mood and normal affect; displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented. (R. 462-63.) His thought process was logical and his concentration and attention were fair. (R. 462-63.) He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage. (R. 463.)

Plaintiff's June 16, June 23, July 21, August 4, August 12, September 7, September 12, September 24, and October 8, 2021 mental status examinations showed that he was appropriately groomed; he was cooperative and engaged; he showed normal speech; he had an "okay" or good mood; a normal affect; his thought process was logical; he displayed no homicidal ideations or psychotic symptoms; he displayed rumination; he was alert and oriented; his concentration and attention were fair; he displayed an age appropriate memory; he had a fair fund of knowledge; he showed fair insight and

judgment; and he displayed developmentally appropriate language usage.  (R. 588, 593.
597-98, 603, 607, 612, 616-17, 621, 626.)  Plaintiff was diagnosed with either anxiety
disorder, adjustment disorder with anxiety, or PTSD during this period.  (R. 588, 593.
598, 603, 607, 612, 622, 626.)

On October 2, 2021, state agency psychologist Michelle Hoy-Watkins, PsyD,
opined that Plaintiff had medically determined mental impairments of a depressive,
bipolar and related disorder; an anxiety related disorder; and a trauma-stressor related
disorder.  (R. 84.)  As part of the social interaction portion of the mental RFC, Dr. Hoy-
Watkins opined that Plaintiff was not significantly limited as to his ability to ask simple
questions or request assistance, accept instructions and respond appropriately to criticism
from supervisors, or his ability to maintain socially appropriate behavior and adhere to
basic standards of neatness and cleanliness.  (R. 87.)  Dr. Hoy-Watkins also found that
Plaintiff was moderately limited as to his ability to: interact appropriately with the
general public and get along with coworkers or peers without distracting them or
exhibiting behavioral extremes.  (R. 87, 97.)  Dr. Hoy-Watkins went on to find that:

> The claimant retains the ability to understand, remember and follow simple
> instructions with adequate CPP. The claimant can adapt to predictable
> changes and work-related stressors. The claimant can engage in brief and
> superficial interactions.

(R. 87, 97.)  On August 30, 2021, on reconsideration, state agency psychologist Russell
Ludke, PhD, LP, found the same limitations with respect to Plaintiff's social functioning.
(R. 107-08, 115-16.)

As part of a November 5, 2021 behavioral follow-up appointment, Plaintiff represented that he had been able to process through family stressors and that he had been visiting his mother more often.  (R. 580.)  There was no identifiable risk of aggression for Plaintiff.  (R. 583.)  Plaintiff's mental status examination showed that he was appropriately groomed; was cooperative and engaged; showed normal speech; had an "okay" mood and normal affect; he displayed no homicidal ideations or psychotic symptoms; displayed rumination; and was alert and oriented.  (R. 583.)  His thought process was logical and his concentration and attention were fair.  (R. 583-84.)  He displayed an age appropriate memory; had a fair fund of knowledge; showed fair insight and judgment; and displayed developmentally appropriate language usage.  (R. 584.)  Plaintiff was diagnosed with anxiety disorder.  (R. 584.)

On February 8, 2022, Plaintiff was seen for a medication follow-up.  (R. 636.)  Plaintiff had PHQ-9 of 11, and a GAD-7 of 9.  (R. 636.)  Plaintiff noted that he became paranoid about going out of the group home alone due to a history of attacks and was experiencing increased anxiety with preparing for his social security hearing.  (R. 636.)  Plaintiff's mood was anxious and he demonstrated a full affect.  (R. 636.)  Plaintiff was grossly oriented, pleasant, and cooperative.  (R. 636.)  Plaintiff's behavior and appearance were within normal limits and his thought process was logical.  (R. 636.)  It was noted he was not taking is fluoxetine daily and he was told that prazosin should be used for panic and anxiety.  (R. 637.)

### III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007) (marks and citations omitted). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). "Assessing and resolving credibility is a matter properly within the purview of the ALJ." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

### IV.    DISCUSSION

Plaintiff argues that the ALJ failed to account for superficial contact in the RFC because, even though the ALJ found the opinions of agency psychologists Drs. Hoy-

Watkins and Ludeke partly persuasive, the RFC was less restrictive than the opinions of Drs. Hoy-Watkins and Ludeke. (Dkt. 16 at 10-11.) Plaintiff asserts that the state agency consulting psychologists separately evaluated Plaintiff's limitations and found that he could only engage in brief and superficial interactions with others, which inherently includes supervisors, coworkers, and the general public, and while the ALJ found these opinions partially persuasive, the ALJ did not limit Plaintiff's interactions with coworkers and supervisors to brief and superficial interactions. (Dkt. 16 at 11.) Instead, the ALJ limited Plaintiff to "occasional interaction with coworkers and supervisors, no interaction with the general public, no tandem tasks with coworkers." (R. 20; Dkt 16 at 11.) Although Plaintiff acknowledged that the ALJ found these opinions only partially persuasive, he argues that the ALJ found that they were only partially persuasive because additional limitations were needed with respect to pace and in reading, writing, and mathematics. (Dkt. 16 at 11.) Plaintiff goes on to argue that the ALJ committed a reversible error by not including a limitation to "superficial" interactions with others in the RFC, as Dr. Sullivan and Dr. Boyd both opined that interactions must be superficial. (*Id.*) According to Plaintiff, the limitation to occasional interactions contained in the RFC does not adequately account for the need to have superficial interactions, as the terms "occasional" and "superficial" are not coterminous. (*Id.* at 12; *see also* Dkt. 22 at 7.)

The Commissioner agrees that "superficial" interactions and "occasional" interactions are different concepts. (Dkt. 18 at 4.) However, the Commissioner counters that the ALJ did not have to use the word "superficial" to convey uncomplicated

qualitative communication. (*Id.*)  In particular, the Commissioner argues that the RFC makes it clear that Plaintiff did not need to communicate with coworkers or supervisors about tasks other than the simple and routine; and had no need to discuss duties involving the general public, coordinate for fast-paced quotas, or interface about anything related to money handling and complex math, reading, or writing. (*Id.*)  The Commissioner also argued, in part, that the ALJ had no obligation to "parrot" a persuasive opinion; that neither Dr. Ludeke nor Dr. Hoy-Watkins strictly limited Plaintiff to only superficial interaction; and that additional limitations in the RFC necessarily eliminated any associated communication with supervisors and coworkers. (Dkt. 18 at 5-6.)

A claimant's RFC is the "most [he] can do despite his limitations, including both physical and mental limitations." *LeeAnthony C. v. Berryhill*, Case No. 18-cv-77 (NEB/TNL), 2019 WL 2343732, at *3 (D. Minn. May 13, 2019) (citing 20 C.F.R. § 416.945).  An ALJ's determination of "a claimant's RFC must be 'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Id.* (quoting *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)).  "The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Ackerman v. Kijakazi*, Case No. 4:21-CV-814 PLC, 2023 WL 2496839, at *4 (E.D. Mo. March 14, 2023) (quoting *Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007)) (cleaned up).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's

ability to function in the workplace." *Id.* (quoting *Combs v. Berryhill*, 878 F.3d 642, 646)

(8th Cir. 2017)).

As stated previously, the ALJ imposed nonexertional limitations in the RFC,

finding Plaintiff:

> [L]imited to simple, routine tasks, occasional interaction with coworkers and supervisors, no interaction with the general public, no tandem tasks with coworkers, no fast paced production requirements defined as work requiring hourly or more frequent production quotas, only occasional reading and writing, and occasional mathematical tasks with no requirement for complex skills in these areas or handling of money.

(R. 21.)  State agency psychologists Dr. Hoy-Watkins and Dr. Ludke opined that

Plaintiff:

> [R]etains the ability to understand, remember and follow simple instructions with adequate CPP. The claimant can adapt to predictable changes and work-related stressors. The claimant can engage in brief and superficial interactions.

(R. 87, 97.)

In analyzing their opinions, the ALJ found as follows:

> The state disability determination agency found that the claimant could understand, remember and follow simple instructions, could adapt to predictable changes and work-related stressors, and could engage in brief and superficial interactions with others. (1A, 3A, 6A, 7A) This opinion is partially persuasive. However, additional limitations regarding pace and in reading, writing and mathematics are supported by the results of neuropsychological evaluation and testing, education records, testing by the prior consulting psychologist and mental status examinations showing anxiety and ruminations.

(R. 26.)

It is true that the ALJ only limited Plaintiff to occasional contact with supervisors

and coworkers, whereas the agency psychologists limited Plaintiff to "brief and

superficial interactions."  (R. 87, 115.)  "Courts have recognized that the terms 'occasional' and 'superficial' are not coterminous."  *Sara R. v. Kijakazi*, No. 22-CV-1271 (KMM/TNL), 2023 WL 4564421, at *6 (D. Minn. June 28, 2023) (collecting cases), *R. & R. adopted*, 2023 WL 4561312 (D. Minn. July 17, 2023); *see also Kenneth J.V. v. Kijakazi*, Civ. No. 22-cv-0373 (KMM/DJF), 2023 WL 2394397, at *10 (D. Minn. Jan. 27, 2023), *R. & R. adopted*, 2023 WL 2388696 (D. Minn. Mar. 7, 2023) ("[T]here is a material difference between a superficial contact and an occasional contact limitation."). "Occasional contact" goes to the quantity of time spent with the individuals, while "superficial contact" goes to the quality of the interaction.  *Sara R.*, 2023 WL 4564421, at * 6 (marks and citations omitted).  As such, "courts routinely find that limiting the *quantity* of time spent with an individual does not accommodate a limitation relating to the *quality* of the interactions—including a limitation to 'superficial' interaction."  *Id.* (quoting *Sue A. M. v. Comm'r of Soc. Sec.*, No. 3:22-cv-171, 2022 WL 14346260, at *4 (S.D. Ohio Oct. 25, 2022)) (citations omitted).

As argued by the Commissioner, the Court acknowledges that the ALJ "is not required to adopt all limitations proposed by [expert reviewers]—even if the ALJ has accorded that [expert's] opinion substantial weight."  *Mark S. v. Saul*, No. 18-cv-02936 (HB), 2020 WL 1043795, at *6 (D. Minn. Mar. 4, 2020).  Rather, the RFC must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of her limitations." *Myers*, 721 F.3d at 527 (citations omitted).  Indeed, as one court has explained:

25

"Superficial" social interaction has no regulatory definition. And while the
state agency psychologists opined Plaintiff should be limited to superficial
interactions, neither defined what "superficial" meant. Accordingly,
precisely how the RFC's limitations differ from superficial interaction
limitations—if they do at all—is unclear. Still, even if the depth of interaction
described in the RFC exceeds "superficial" interaction, the ALJ was not
required to adopt the state agency psychologists' opinions in their entirety.

*Sasha M. v. Comm'r of Soc. Sec.*, No. 2:22-CV-2101, 2023 WL 1793536, at *9 (S.D.

Ohio Feb. 7, 2023) (citing *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 276 (6th

Cir. 2015)) (citations omitted).

The Court concludes that the ALJ's reference to "occasional" contact with

supervisors and coworkers does not conflict with the opinions of the state agency

psychologists. As stated above, "the term 'superficial' is defined by neither the DOT nor

in Social Security regulations, SSRs, or HALLEX." *Amber L. v. Comm'r of Soc. Sec.

Admin.*, No. 3:21-CV-00202, 2022 WL 2948952, at *6 (S.D. Ohio July 26, 2022), *R. &

R. adopted*, 2022 WL 3226351 (S.D. Ohio Aug. 10, 2022). The Eighth Circuit has

recently rejected arguments that the failure to parrot the term "superficial" requires

automatic reversal of the ALJ's denial of benefits, especially where the ALJ addressed

the quality of a claimant's workplace interactions:

Lane argues that the ALJ's reference to "occasional" interactions is
inconsistent with the shared opinion of two psychologists, which the ALJ
found persuasive, that he could have "superficial" interactions. He reasons
that because the terms are different—the former being about quantity and the
latter about quality—omitting the psychologists' limitation renders the
expert's conclusion unreliable and the ALJ's decision without substantial
evidence.

We reject this manufactured inconsistency. The psychologists noted that
Lane could relate to others superficially, work in small groups, and maintain

26

> at least minimal relationships with others. Nothing in the reference to
> "occasional" interactions conflicts with that opinion. And the ALJ,
> considering the entire record, addressed the quality of Lane's workplace
> interactions: no team, tandem, or public-facing work. We decline to nitpick
> its well-reasoned decision.

*Lane v. O'Malley*, No. 23-1432, 2024 WL 302395, at *1 (8th Cir. Jan. 26, 2024) (citation

omitted). Here, the ALJ addressed the quality of the interactions of Plaintiff by

restricting him to no work involving interaction with the public and no tandem work. *See*

*id.*; *see also Charlita N., v. O'Malley*, No. 23-CV-1283 (NEB/DTS), 2024 WL 1667155,

at *1 (D. Minn. Apr. 15, 2024) (The ALJ's reference to "occasional" does not conflict

with these opinions. The ALJ also determined that Plaintiff should have 'no tandem

tasks or teamwork' and 'no interactions with the general public.' (Admin Rec. at 25.)

Thus, contrary to Plaintiff's assertion, the ALJ addressed the quality of Plaintiff's

interactions with coworkers: 'no team, tandem, or public-facing work.'").

Plaintiff references the fact that in the analysis of the "Paragraph B" criteria, the

ALJ assessed Plaintiff as having "moderate limitations" in social interactions, based on

his reports that he does not like people and does not like to leave his house and mental

status reports showing some anxiety and rumination. (Dkt. 16 at 10-11.) Indeed, the

state agency psychologists found that Plaintiff had moderate mental impairment with

respect to the ability to "interact with others." (R. 84.) However, under the applicable

regulations the SSA defines a moderate limitation under the "Paragraph B" criteria as

follows: "Moderate limitation. Your functioning in this area independently,

appropriately, effectively, and **on a sustained basis is fair**." 20 C.F.R. § Pt. 404, Subpt.

P, App. 1 § 12.00 (F)(2)(c) (*effective* April 2, 2021 to October 5, 2023) (emphasis added). In other words, a moderate limitation under this "Paragraph B" criteria does not preclude social interaction.

Moreover, the state agency psychologists made additional findings as to Plaintiff's ability to interact with specific categories of people, as set forth below:

| Social Interaction Limitation | Rating |
| --- | --- |
| The ability to interact appropriately with the general public | Moderately Limited |
| The ability to ask simple questions or request assistance | Not Significantly Limited |
| The ability to accept instructions and respond appropriately to criticism from supervisors | Not Significantly Limited |
| The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes | Moderately Limited |
| The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness | Not Significantly Limited |

(R. 87, 115.)  Given that the state agency psychologists opined Plaintiff has **a fair ability** on a sustained basis to get along with his coworkers **and no** significant limitations regarding dealing with supervisors, it is hard for the Court to comprehend how the omission of a superficial interaction limitation as to coworkers and supervisors, where the RFC limited Plaintiff to occasional interaction with those groups, is inconsistent with the opinions of the state agency psychologists.[5]

---

[5]    The Court notes that Plaintiff argues that the RFC is silent as to the quality of contact with respect to supervisors, as compared to coworkers.  (Dkt. 16 at 13.)  Even assuming that this is true, this argument ignores the state agency psychologists' opinions that Plaintiff had no significant limitations when interacting with supervisors.  The Court will not order remand based on a deficiency in opinion writing by the ALJ, especially when the decision is supported by substantial evidence.  *See Charlita*, 2024 WL 1667155, at *2.

Further, the ALJ "was not required to adopt the exact limitations set forth in the opinions she found partially persuasive, and her residual functional capacity (RFC) determination regarding [Plaintiff's] abilities to interact with others was supported." *McKinney v. O'Malley*, No. 23-3220, 2024 WL 1327965, at *1 (8th Cir. Mar. 28, 2024) (citation omitted); *see also Wyatt v. Kijakazi*, No. 23-1559, 2023 WL 6629761, at *1 (8th Cir. Oct. 12, 2023) ("The ALJ was not required to adopt the exact limitations set forth in the opinions she found persuasive, and substantial evidence supported the RFC findings regarding Wyatt's abilities to interact with others in the workplace.") (citations omitted).[6] Here, the ALJ found as follows:

> Overall, the evidence shows the claimant was living in the Cummings Residence due to lack of housing rather than his mental health. He was able to come and go, and often stayed out at friends' houses or out late doing things. He managed his own medications, and staff just locked them up for him. He was doing his own laundry and shopping for personal care items. Mental status examinations have been mostly normal, with some anxiety along with passive suicidal ideation and ruminations. He also reported some paranoia about leaving his residence and sleeping in the residence due to his history of being attacked. However, the claimant reports improvement with treatment. He testified that he has been living alone in an apartment for about 4 months. He manages his grocery shopping, cooking, cleaning, and medications independently. The record therefore supports the limitation to

---

[6]     Plaintiff argues that the ALJ was required to adopt the language of the state agency psychologists that she found persuasive. (Dkt. 22 at 8-9). As set forth above, the Eighth Circuit has rejected this argument, especially where the RFC is supported by substantial evidence. The Court also rejects Plaintiff's argument that the ALJ failed to "build an accurate and logical bridge between [her] decision related to limitations in social interactions and the evidence. (*See id.* at 9.) First, "the regulations do not explicitly require an ALJ to provide a 'logical bridge' in explaining the basis for a decision denying benefits." *Jennifer O.*, 2024 WL 86277, at *4. Even if this were a requirement, the ALJ set forth what evidence supports her determination about the degree of limitation appropriate for social interactions in a work setting. (R. 22-26.) This Court can understand the ALJ's rationale and has found the ALJ's RFC and conclusions supported by substantial evidence. *See Jennifer O.*, 2024 WL 86277, at *4.

> simple, routine, tasks, occasional interactions with coworkers and supervisors, no interaction with the public, and no tandem tasks with coworkers.

(R. 25.)

Indeed, outside of ruminations, anxiety, and occasional depressed mood (managed with medication), Plaintiff's mental examinations during the relevant period were largely normal and stable. (*See, e.g.*, R. 648, 455, 462, 467, 468, 469, 473-74, 483, 487, 492, 493-94, 498, 503, 512, 521, 533-34 538, 551, 552, 588, 593. 597-98, 603, 607, 612, 616-17, 621, 626.) During his examinations, providers also found there was no identifiable risk of aggression for Plaintiff and no impulse control symptoms. (*See, e.g.*, R. 455, 462, 473, 478, 481-82, 487, 492, 502, 521, 533, 538.) He reported living in a group home and staying with a friend at night during the relevant period. (R. 468, 484, 494, 495, 518, 527, 529-30, 535, 539.) Plaintiff represented that he had been working to build his confidence in socializing with other group home members. (R. 468.) Even when there was a fight at the group home, Plaintiff reported that he and his roommate left the area during the fight. (R. 475.)

Further, it is important to note, as argued by Defendant (Dkt. 18 at 10), that the ALJ limited Plaintiff to unskilled work. (R. 25, 76.) "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling 83-15, Titles II & XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely

Nonexertional Impairments, 1985 WL 56857, at *4 (Social Sec. Admin. Jan. 1, 1985).

"A substantial loss of ability to meet any of these basic work-related activities would

severely limit the potential occupational base." *Id.* "These jobs ordinarily involve

dealing primarily with objects, rather than with data or people. . . ." *Id.* This is the type

of work the ALJ set forth in the RFC.[7] Plaintiff argues that there are no cases finding a

limitation to simple tasks or "unskilled work" automatically accounts for a superficial

social contact. (Dkt. 22 at 3.) But this argument ignores that it is this Court's task is to

determine whether the RFC is supported by substantial evidence as a whole, including the

limitation of "unskilled work":

> First, limitations regarding social interactions in the workplace are
> "commonplace in unskilled work that involves 'dealing primarily with
> objects, rather than with data or people,' " which is the type of work that the
> ALJ recommended for Ms. O. *Dereschuk v. Colvin*, No. 15-CV-86 (TNL),
> 2016 WL 9454329, at *25 (D. Minn. Mar. 28, 2016) (quoting SSR 85–15,
> 1985 WL 56857, at *4), *aff'd sub nom. Dereschuk v. Berryhill*, 691 F. App'x
> 292 (8th Cir. 2017). Ms. O is correct that the ALJ noted that Ms. O "reported
> difficulty getting along with others. She felt authority figures were
> intimidating." [R. at 24.] But the ALJ further explained that "[s]he was never
> fired or laid off from a job because of problems getting along with others."

---

[7]    The Commissioner asserts in his brief that "Plaintiff's work communication would relate solely to performing tasks so simple and so routine that his interaction would occur, at most, 2.64 hours out of 8.  While some jobs with occasional interaction could require intricate and nuanced communications during the 2.64 hours, Plaintiff has made no showing that the three unskilled jobs identified for him fall into this category."  (Dkt 18 at 4.)  In his Reply, Plaintiff seizes on the phrase "nuanced communication" to mean that the VE should have been given a hypothetical that addressed the issue of superficial contacts.  (Dkt. 22 at 3-4.)  However, a "hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ.  A hypothetical is not insufficient because it does not include all the health limitations alleged by the claimant."  *Ross v. O'Malley*, 92 F.4th 775, 781 (8th Cir. 2024) (marks and citation omitted).  Given that the Court has found that the RFC is supported by substantial evidence and Plaintiff does not argue that the jobs propounded by the VE do not comply with the hypothetical, the Court sees no basis for reversal.

[*Id.*] Ms. O fails to reference any evidence that would support a greater restriction regarding her interactions with supervisors and coworkers.

*Jennifer O. v. O'Malley*, No. 22-CV-2273 (KMM/ECW), 2024 WL 86277, at *4 (D. Minn. Jan. 8, 2024).

Based on the record as a whole, the Court finds that the RFC, including the ALJ's omission of a superficial limitation related to interacting with coworkers and supervisors, is supported by substantial evidence.  There is simply no evidence that Plaintiff was having difficulty interacting with others to the level requiring only superficial contact with coworkers or supervisors, and in fact the state agency psychologists opined Plaintiff has **a fair ability** on a sustained basis to get along with his coworkers **and no** significant limitations regarding dealing with supervisors.  (R. 87, 115.)  Plaintiff lived in a group home, stayed at a friend's home, was able to navigate conflicts in the group setting, and admitted that he had developed coping mechanisms and had made efforts to socialize with others.  There is no evidence that he was aggressive to others or had real life difficulties interacting with others during the relevant period to warrant such a limitation.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.    Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 16, 22) be **DENIED**;

2.    The Commissioner's request that the Court affirm the decision (Dkt. 18) be **GRANTED**; and

3.    The Complaint (Dkt. 1) be **DISMISSED WITH PREJUDICE**.


DATED:  May 31, 2024                    _s/Elizabeth Cowan Wright_
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge




## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).